Please all rise. Hear ye, hear ye, hear ye. This Honorable Kellett Court for the 2nd Judicial District is now open for suit to adjourn. The Honorable John C. Hudson is up. Thank you. Please be seated. Good morning, everyone. My name is Casey LaDoc. It's 2-16-09-59. As is always the case, I would like to thank Ms. Kathleen, Ms. Jennifer, Mr. Mueller, et al., and Ms. Kellett. On behalf of Ms. Kathleen, Mr. David Azzam. Also on behalf of Ms. Kathleen, Mr. Ryan F. Padrino. On behalf of Ms. Jennifer Kellett, Mr. Daniel C. Shcherer. All right, counsel. As a procedural matter, it's my understanding that the appellee's attorneys have agreed to split the time. Is that correct? It is correct. Any objection? No objection. All right. Then, Mr. Shapiro, on behalf of the appellants, will you proceed? Good morning, counsel. May it please the Court. My name is Daniel Shapiro, and I represent the appellants. This case is about an erroneous decision by the Director of Planning in Lake County, Mr. Eric Wagner, resulting in a drastic change of use of Midlothian Manor from an assisted living facility to a government use. Now, there was a variety, there was a plurality of, as I'm reading this, the Board members expressly cited improper classification as the basic grounds for reversing the Director, correct? That's correct. But there were a number of other opinions given or reasons, rationales given for that. That's correct. Can you summarize that for us? Well, it is hard to summarize five different opinions, but I think at its core... And that's the point, they were all different. I think I recognize that, Justice Burkett, but I think at its core, what the ZBA decided in the 514th is that the Director erred. And he erred for various reasons, and they picked up in their conclusions and in their statements at the end of the hearing the various reasons why he erred. They don't all have to articulate the same reason, but the bottom line is that he erred for a number of reasons. But the basic reason was that the plurality was that the Director erred because he improperly classified the Midlothian Manor as a government use. That's correct. Is that the essence? That's correct. And that's exactly what our administrative appeal was to him in the first place. That's exactly why we sought the appeal before the ZBA back in 2015. So to that point, Your Honor, I believe that their findings of fact, although not pristine, not perfect, were enough for an intelligent review. And that's what the Lucy B case says. If you have an intelligent review of the findings of fact, as Your Honor just identified, then those findings of fact are adequate. Contrary to what my opponents would say, this does not demand a reversal because those findings of fact aren't pristine. Is there a majority rationale from the Board? Well, I think what we just heard and what we discussed is the majority rationale is that it was an improper classification. Within that rationale, there are different reasons for an improper classification. But I think the majority, the 5-1 rationale, rather, was that it was improper. It was improper for a number of reasons, one, both procedurally and, second, substantively. Both of those, I believe, that this case really set, because of that decision, precedent in the county of Lake for such a decision. Which what I would like to discuss with you today, in addition to what we have just discussed, are three issues. One, whether the classification by the director was appropriate and whether the ZBA correctly found that his classification, which really resulted without public input or public hearing, was inappropriate. Was the ZBA right? Getting to the point, why was the classification improper? It seems like the Act expressly permits the authority to contractually partner with other entities to provide the type of services that further the authority. So superficially, it appears that this would have been a proper classification. So why is it an improper classification? And I think that's just the key, Your Honor. I believe that what the director did was look at it on a superficial basis and not look at it in a more meaningful basis. That's why here, to answer your question, if you look at the definition of government use, and we also look at the definition of government buildings in the UDL, what is a government use? A building or structure owned or leased by a unit of government. We have that. There's no dispute. It's owned or leased by the housing authority. But the balance of the definition is important. And used by the unit of government as opposed to being leased from. Used by, meaning it has to be used by that unit of local government. And it's just the unit of local. I'm sorry, Your Honor. A unit of local. They can contract out services, correct? That was one of the questions that was... Governments do it all the time. They can't contract it out. But in this case, they didn't. In this case, what we have is PATH as a tenant. Now, we work with the facts that we have. And the facts, what we have here is that PATH is a private entity leasing a property owned by a government. That doesn't fit the government use interpretation. Furthermore, if you look at the definition... Was there something that prevented the unit of government from leasing a building that it owns? No, there's nothing to prevent it. But it can't be government use. You can't classify it as a government use. There's nothing in the ordinance or the law that says you can't lease it. But what the ordinance in UDO says is, here's the definition of a government use. Here's the definition of a government building. If you look at what the government buildings... The examples of the government buildings as defined and as articulated in UDO, they're like postal offices, public libraries, water treatment plants. Those are the traditional sort of open public uses that we see. So you're saying PATH is not going to be a public use? Is that what you're saying? What I'm saying is PATH is... And that's what we work with, and that's what we complained about. Now, I suppose theoretically, if there were a different definition or different characterizations of public use, we would have a different story. But what we have here is kind of a unilateral change and a very cursory consideration by the director, saying that because PATH is now leasing from a government unit, which owns the property, therefore, it is necessarily a government use. We don't believe that's correct. Not only because the definition of government use doesn't mandate that. What's the effect of the Housing Authorities Act on the ordinance? Section 10 of the Housing Authorities Act requires that the housing authority comply with local zoning regulations, in essence. What's the mission of the housing authority? Well, I'll let the housing authority speak to that. But what I understand the mission to be was to provide good housing for those in need. Right. And we don't disagree with that. They can't do that through PATH. They certainly can do that through PATH. But not in this fashion? But not in this fashion. Not in a government use without a public hearing. Not in a government use as a matter of right, a permitted use as a matter of right in a residential neighborhood. Just to explain further, the R1, 40,000 with minimum square foot lots, allow for certain permitted or special uses. Government use would be if government use is a permitted use as a matter of right. Our position is that this is not a government use. Should they want to have the PATH facility there, it could be either an assisted living facility or it could be a government use with assembly, both of which require a public hearing. So I'm not saying they can't have it. What I'm saying is the classification to a government use as a matter of right is inappropriate. If it were determined, and I believe one or two of the commissioners found that it was more akin to group living, that's not allowed at all on the R1. So the application for a change of use and the granting of a change of use without rule is why we're here. So if we were to accede to the accuracy of your position, what would be the relief you would be asking us for specifically? Sure. The relief that I'm asking for is to affirm the ZBA. And the ZBA found that the director erred. Now, if PATH or if the county of Lakewood wants to refile an application in an appropriate way, seeking a conditional use for assisted living or seeking a conditional use for a government use with assembly, they're free to do that. And what's this about a public hearing? You said they could do it perhaps with a public hearing. Sure. In the zoning ordinance, you have different types of uses, permitted, prohibited, or conditional. Any conditional use requires a public hearing before a conditional use permit would be issued. A conditional use permit requires a public hearing where neighbors are noticed, where it's put in the newspaper, where the statutory requirements of at least 15 days of the hearing before work occur is followed through, where the public can then come in and offer its testimony and cross-examination comments. Furthermore, a conditional use permit usually requires higher standards because it's not a matter of right. So with conditional uses, where, for example, a government use with assembly is noted as a conditional use in the use data, you have to have a public hearing in that regard. Then a conditional use permit is then issued by the ZBA, and then you go forward from there. Are you saying that it's not the case that PADS could never run a program out of this building, that there are certain procedural steps that have to be followed that were not followed through? Correct. Is that sort of the essence of your position? Exactly. And we believe that there was a circumvention of the zoning ordinance which allowed that to happen. We're not saying that PADS is neither noble nor worthy. It is. We're not saying that at some point, should they wish to operate out of a milking manor, they can't. What we're saying is if you want to do it, it's got to be done the right way, and it can't be done where you sidestep the process, where you try to fit a definition in the government use as a square peg in a round hole. That's what was done here. That's what the ZBA assessed after the many hours and evidence and testimony of the witnesses, after asking the director direct questions and having him answer those questions. That's what the ZBA concluded. Now, this court, as this court knows, there is a certain deference which is allowed to the ZBA given its expertise, its experience, its assessment of the credibility of the witnesses. And moreover, the ZBA did make its decisions with that in mind. So while we're on that, what is, in your opinion, the standard of review? Is it manifest way? Is it a noble review for us? Is it a combination of clearly erroneous? So what is the burden of proof then? This has been an issue that I believe we have struggled with and the circuit court struggled with. But it's our position that your standard of review is clearly erroneous. Now, we believe that in part because of the Goodman case. And the Goodman case says when you have undisputed facts or established facts, and you have established law, in this case, established law is the UDO. And the question is the application of the facts to the law, to the UDO. Then you have mixed questions of fact and law, and that's clearly erroneous. That's a clearly erroneous standard. And that's what we submit as your standard of review in this case. It allows for some deference to the ZBA, but it's not the manifest way to the evidence standard. It's also interesting to note that the original complaint filed by the housing authority almost suggests the same because in their original complaint, they alleged that the ZBA made an erroneous decision. So picking up, not only do we believe that the standard is clearly erroneous, but it somewhat appears that the housing authority does as well. And we're repealing the board's decision, not the tribe's. That's correct. And we both agree to that. It's your review of the agency's decision, and the agency hears that Lake County is willing to appeal. And I will tell you that in their brief, I believe, on page 17 or 19, has also recognized that to be the case. So it's, in essence, to sum up. Should we search the record for reasons to support the board's decision? I'm sorry? Should we be searching the record for reasons to support the board's decision? I think your charge here. We began with your concession that the board was all over the board, essentially. Yeah, I think your charge here is to determine, excuse me, is to determine whether the board in its bylaw made a decision which was clearly erroneous. I don't think it requires a search of the record. Isn't it, you know, very good? No, for the reasons that I just said. Because there are questions of fact and law, which then goes to the standard of clearly erroneous. And because of what the Goodman case tells us. Now, my opponents would urge you to take a de novo review. We obviously disagree with that. But in doing that, they then say, well, the director's decision, Lake County Director Wagner's decision, enjoys a presumption of correctness. And so they kind of bootstrap that into a de novo review. We disagree that that bootstrapping is appropriate. Because even though his decision enjoys a presumption of correctness, it's rebuttable. The reason it's rebuttable is because there's a process in the UDO to challenge his administrative decision. And that's exactly what we did. If there wasn't a process, then it wouldn't be rebuttable. And, in fact, we did rebut it. So it doesn't enjoy kind of like a criminal law beyond a reasonable doubt standard. It's rebuttable. And if when you seek to rebut it to go before the ZBA, the ZBA determines he's an error, then it's incorrect. And so just because it enjoys a presumption of correctness doesn't mean it's sacrosanct at all. Nor does it mean that, therefore, they didn't know how the standard applies. In speaking about the director's decision, kind of going back to the beginning of this argument, it is interesting to note the comparison between the review process, decision-making process, which was undergone by Director Wagner versus the ZBA. In our briefs, we noted that Director Wagner made a very cursory review in coming to his decision that his government used as a matter of right. If I could just finish this up. Thank you. There are many things that he failed to consider or chose not to consider, and those are articulated in our brief, versus the ZBA's consideration of evidence and testimony. The ZBA did its job. They did its job in coming to its conclusion, contrary to what Director Wagner did. So that comparison, I think, is striking. I see that I'm on time. I'm happy to carry on. Any questions? All right. Thank you very much. Thank you. Pursuant to the stipulation, Mr. Hazan, you will have five minutes on behalf of the Housing Authority. Thank you, Your Honor. May it please the Court, my name is David Hazan, and I am representing the Housing Authority of Lake County on this matter. I just want to take a few minutes in a general overview regarding the definition being used by the appellants for governmental use. And the reason is their restrictive definition has a serious impact on the future of the Housing Authority's ability to carry out its functions under the Housing Act. And that's the place where we start. Under Section 2 of the Housing Act, the authority is granted, it charges the authority to assist any individual, association, corporation, or organization which presents a plan to provide a decent, safe, sanitary, and affordable housing to the underserved and disadvantaged. In Section 5 of the Act, as Your Honors noted previously, it allows the authority and the power to execute contracts or other instruments necessary or convenient to further the purposes of the Act. This project fits exactly the private and public sector cooperation that both the County of Lake and HUD issued directives on to try and end the problem of homelessness, specifically the properties owned by the Housing Authority. The property was vacant and has been vacant since 2010. They issued their request for proposal, and the proposal from PEDS was to operate their Safe Haven Program. This is exactly the type of public and private sector cooperation that the directives were looking for. Their Safe Haven Program is a use that's within the description of the mandate of the Housing Authority to provide safe, secure housing for the underserved, and that's exactly what's going on here. But what do you make of this argument that even if it has some superficial or intuitive appeal, there should have been a public hearing, it shouldn't have been granted as a matter of right. There's too many variables going into this consideration. Well, I don't know that there are that many variables. If it fits within government use without assembly space, then they're entitled to the exemption, and there's no need for the public appeal. Really, the crux of our argument is it fits the definition. The appellants have added a little requirement of direct occupation to be able to fit the definition of governmental use, but those words are nowhere found in the definition of governmental use. And I believe Director Wagner realized that. He viewed this as governmental use without assembly space, which means they don't require the public hearing. Now, I'd just like to touch on also the idea that you're commenting on assembly space. What is assembly space? Well, under the UDL, it defines assembly space that's open to the public and that it can only be used between 8 a.m. and 8 p.m., and if you do it otherwise, a permit is required, and there's a limitation of 50 such assemblies per year. As restrictive as they are in governmental use, they become more expansive when it comes to assembly space because the argument from the board was that there was assembly space. Now, this is a small common area in the building. David Northern testified that he didn't think all 14 of the residents that would be there would be able to fit in the common space, and I believe Judge Shippers, even though it's a review of the ultimate decision, we believe Judge Shippers hit it right on this because he basically found it leads to an absurd result. If two of the residents went down after 8 p.m. to share a pizza and talk about election results, they need a permit to do it, and it just doesn't make sense. So thank you, Your Honors. I'd like to hand it off to the attorneys. Thank you. Good morning, Your Honors. My name is Mariah Degrino with the law firm of DLA Piper. Seated at the table with Mr. Hazen is Tom Geselbrock, DASO of DLA. We represent Hadslake County in this matter. May it please the Court. The Circuit Court's decision should be affirmed because, quite simply, the proposed use is a government use under the Unified Development Ordinance and, therefore, is permitted. First, I want to address head-on this notion that PADS and the Housing Authority have somehow tried to skirt the requirements of the Unified Development Ordinance in the law, including Section 10 of the Housing Act, and it's simply not the case here. It was PADS and the Housing Authority that approached the department, the county, to inquire as to the permitting process for reopening Midlothian Manor. Director Wagner undertook a very deliberative process to make the appropriate interpretation, sought the counsel of his staff, sought additional information from PADS, from the Housing Authority, even sought counsel from the state's attorney's office. Only then, after reviewing all of the facts and circumstances and the applicable provisions of the law, did he then make his decision. In this respect, this case is very different from the Gerba case that was before this court on appeal several years ago. In that case, the school district unsuccessfully argued that it simply was not subject to local zoning ordinances. This is not an argument that the Housing Authority or PADS have ever made, nor has their conduct even remotely suggested that. The major difference here is that the Lake County Board has created a distinct class of uses under the Unified Development Ordinance for government use. The practical and legal effect of this is that there are some uses that are permitted in the R1 district because they qualify as government uses, even though a functionally identical use would not be permitted if it were private. Director Wagner, in his testimony to the ZBA, gave the example of an equipment storage yard, which the ZBA had considered earlier on that first day of the hearings. In that instance, the applicant was a township authority using township-owned property to store maintenance equipment, and therefore it was allowed on that particular site as a government use. Director Wagner pointed out that had the applicant been a private owner seeking to use privately owned property to store equipment, the use would not be allowed at all. And that's really the heart of the appellant's complaints here. Well, isn't the heart of the issue, is this truly government use? That's their argument, but I think the heart of their complaint really is that the Lake County Board has decided to give government units more flexibility in the use of their property than private owners. We could be talking about a water plant, a sewage plant, a firehouse, a township equipment storage yard, or a bus farm going in on this site near these residences, but we're not because we're talking about housing for homeless people in an existing vacant facility already owned by the housing authority. Now, this proposal uses a public-private partnership approach, which is used by many units of government at all levels throughout the country, including leases. Leases are very frequently used to implement these public-private partnerships. The federal government HUD encourages local housing authorities to use public-private partnerships to end homelessness, specifically to address the needs of this population that this program would target, the chronically homeless individuals. Is this temporary or permanent housing? It's permanent housing. They sign leases for a year at a time, and it's intended to be their permanent house. So in essence, one of the disputes is you seem to be saying that the appellant's argument over the intent of the Act, the Enabling Act, is too restrictive. The intent would be to allow something like this within the scope. You're saying their interpretation is way too restrictive. I think that's fair. It's not only too restrictive, it renders the definition of government use and the classification of allowing government uses in the R1 district as permitted uses, it renders that completely useless. And again, the beauty of the public-private partnership is that it allows a unit of government, such as the housing authority, to leverage the resources and the expertise of the private sector to fulfill a statutory mission. In this case, the expertise of PATHS to reach a narrow segment of the homeless population to fulfill the housing authority's mission of providing housing. Should there have been a public hearing in this matter? Should there have been? If counsel was alluding to, should there have been one? No. Why not? Because it's a permitted use in the R1 district as a government use. Just like any other application, the director had the authority to pass on it without a hearing. That's correct. As long as it fit the criteria, correct? That's correct. So an interest like PATHS is merely an instrumentality of the housing authority. Just like a paving company is to a municipality, it doesn't make the roads any less public. So is it your position that for this use not being used for homeless people who probably wouldn't be here today? I believe they've conceded that they've acknowledged that government uses would include things like a wastewater treatment plant, that if a wastewater treatment plant were the use being proposed, that it would be permitted in the R1 district and that would be that. And again, what they really disagree with is the plain reading of the definition of government use under the UDL. Getting into the questions that your honors were raising earlier in terms of the standard of review, these questions, when you peel them back, really raise interpretive questions of law which are subject to de novo review. First, they contend that in order for a government unit to use its property, it must, quote, directly use the property. As Mr. Hazen remarked, directly use does not appear anywhere in the definition of government use. It was invented by the appellants in this case. Second, the appellants contend that the facility must be open to the public. Again, this is created completely out of thin air, and it's grounded in the mistaken belief that all government property and government uses are open to the public. Many government uses, including some of those listed in the definition of government use, are not open to the public. Public access is restricted in many cases because of security reasons or because of the nature of the facility. Police training academies, firehouses, again, sewer and water treatment plants frequently are not open to the public. Water towers, jails, prisons, schools, municipal energy facilities, equipment storage yards and bus farms, and even this building was restricted access when I entered this morning. The appellants also disagree with the legal effect of the relationship between the housing authority and PADS and whether the housing authority is exercising its statutory authority in entering into a contract with PADS. Again, these raise questions of law subject to de novo review. The appellants contend that the housing authority cannot lease the facility to PADS as part of a public-private partnership, that the housing authority is not acting in its statutory capacity. They go through a protracted analysis to demonstrate that PADS is not a government agency, which is beside the point. The housing authority makes clear that the housing authority's or the Illinois Housing Authority Act makes clear that the housing authority's powers include the power to enter into contracts and other instruments necessary or convenient to the exercise of the powers of the authority, which would include leases. The housing authority's lease makes clear that the housing authority retains ownership and considerable control over the property, including the right to approve subleases, the responsibility for exterior and building maintenance, and the right to inspect the property to determine if the use is in compliance with the goals of the housing authority. The tenant selection process itself takes place through a wait list maintained and administered by the Lake County Community Development Department under a HUD directive. PADS, again, is merely an instrumentality of the housing authority in its effort to combat homelessness. Who manages the facility? Again, property and building exterior maintenance is managed by the housing authority itself. PADS employees will be, there will be an employee at the site to act as sort of a desk receptionist as there's a single point of entry into the building. And so as people come in, they will act as sort of that first barrier of security to make sure that it's the residents that are entering the building. And it's PADS who chooses the residents and monitors the residents? They select them from the wait list again based on, so there's sort of an eligibility criteria that they have to meet in order to be eligible for housing in this particular program. Who maintains the wait list? The Lake County Community Development Department does. Okay. So again, other questions of law, again, subject to de novo review, address the process and the legal effect of certain other provisions of the Unified Development Ordinance. For example, the appellants urged that Director Wagner was required to undertake a similar use analysis. However, the UDO states that the similar use analysis is only required if a use is not listed in the use table. In this instance, government use is listed in the use table as a permitted use in the R1 district. The appellants also questioned the legal effect of Appendix F, contending that Appendix F alters the definition of government use. Essentially, they argue that because Appendix F lists government uses only under the non-residential section of the table, that government uses can only ever be non-residential. However, this misstates the legal effect of Appendix F. Section 151.11a of the UDO makes clear that the use table, not Appendix F, lists the uses allowed within the zoning districts. I can finish with that? Yes, you may. Subsection B notes that the use table lists some of the specific use types included within respective categories. Subsection C then states that a detailed listing of specific use types and their assignments are listed in Appendix F. In other words, Appendix F supplements but does not supplant the use table. I hear that my time has expired. I'm happy to address additional questions. Thank you very much, Ms. Shapiro. Ms. Shapiro, you may proceed. Thank you. Could you respond to the comments about Appendix F? Sure, I'd be happy to. Appendix F is something of a great discussion between us, but what has been ignored by counsel is that the UDO itself directs how we should look at Appendix F. And it says, Ordinance users interested in reviewing a more detailed listing of specific uses should refer to Appendix F. Appendix F has like 350 uses. As you saw in our brief, the use table has 100. Clearly, it is more specific. And not only the UDO, but the county's code directs that when there's a conflict or when one provision is more specific than the other, then the more specific controls. So to that extent, Appendix F is more than just a mere reference, as counsel would suggest. Appendix F does not supplant the ordinance. It supplements the ordinance. So that's why we believe that your review of Appendix F is more than just a mere reference. It's important. Appendix F identifies, as you know, various uses. Under non-residential uses, a category is community service. Under community service is government use. So we see in Appendix F that government use is identified in the UDO. Appendix F, as a supplement to the use table, as a non-residential use. Did the board reclassify Midlothian Manor? The director reclassified Midlothian Manor. The director reclassified it. But the board didn't in reviewing the director's decision. The board found that the board found that's correct. The board found that the director erred. It didn't take that next step to reclassify. Right. So I agree with you. What's the classification for Midlothian Manor? What should it be? Well, that gets to our discussion of other uses. We believe that it would either be more appropriate as a group home or group living or assisted living. My opponents will argue strenuously it can't be group living because that is prohibited in the R1. Whether it's prohibited or not, to answer your question, it is more akin to group living. The proposed use for passing Midlothian Manor is more akin to group living. More akin than government use? Absolutely. Absolutely. And also more akin to assisted living than it is to government use. In fact, those happen. Why can't group living or assisted living be a government use? I'm sorry? Are you suggesting that group living or assisted living cannot be a government use? Under these circumstances, no, they are the classification themselves. They're either assisted living, group living, or government use. You can't have a duality. It can't be like both. But it could be. It could be a facility that provides for homeless people where the owner is a government owner. And that goes back to your list by argument, right? Yeah. So they're mutually exclusive. You're saying the statute, the act provides no, it cannot ever encompass, as she alluded to, a partnership between the government and a private agency, even for government use, ostensibly. There's no mechanism to do that? There's no mechanism to do that under these circumstances. Under what circumstances? That's not contemplated under the UDO, as I see it. So you disagree with her interpretation? I disagree with her interpretation. I disagree with her interpretation, given the definitions that we have to work with under the UDO, the definition not only of government use, but government buildings. Regardless of the mission, HUD is? We applaud the mission. That's not a question. I hope that homelessness is cured, not only in Lake County, but all over. I think PASS is a great thing. As a matter of fact, some of the plaintiffs probably contributed to PASS. That's not the issue. The issue is whether, from a zoning and process perspective, the director committed error. That's the issue. And the ZBA found that he did. Now, it doesn't mean that this can't happen in another way or another application or another process. That process would allow a meeting? A public hearing as required under, you know, whatever application they would file for. Assisted living requires for a conditional use permit. That requires a hearing. If they were to file for a government use with assembly, that would require a public hearing. But neither of those applications were filed, and obviously neither of those public hearings. Talk about the assembly. Yes. What assembly are we talking about? To answer your question, I think it's important to go back to the definition of assembly, if I may. It just gives context. Assembly space is... Go ahead. Assembly space in the UDO is intended to accommodate a group of people gathered together for a particular purpose, whether that be religious, political, educational, or social. It may include, but is not limited to, meeting rooms, halls, classrooms, worship halls, and social halls. The record is clear that the MacLean Manor, for the past facility, has a community kitchen area, a community eating area, a community kitchen area, an area where folks can watch TV and socialize. It has a lobby. It has gathering areas that I would submit falls within this definition because those are areas where folks could socialize. That was defined... I'm sorry. That was testified by David Norton. And how many people does it take to form an assembly? Would two people having a snack be an assembly? It could. It depends where. If it's in one's room, it's not an assembly. If it's more of a common area... If it's in a hallway? If it's in a hallway, it's not necessarily a common assembly area. What if it's sitting out on an enclosed porch area? Each of these units had their own private porch. So if it's in a private porch, that's not a common area. If it were, say, the TV room, then I think it is assembly, regardless if it's 220 or 220. There's nothing in the Senate that says it has to fit all the people in the facility. So if it fits 14 or doesn't fit 14, I would suggest that's irrelevant in determining whether there is assembly. Anything further? No. All right. Thank you, Mr. Chairman. Thank you. I'd like to thank the attorneys for the quality of all the arguments here this morning. The matter will, of course, be taken under advisement, and a written decision will issue in due course. There will be a brief recess while we prepare for the next case. Thank you. Good evening.